Filed 2/21/25  P. v. Banks CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>NATHAN BANKS,<br><br>    Defendant and Appellant. | F087134<br><br>(Super. Ct. No. BF109478B)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Michael G. Bush, Judge.

John F. Schuck, under appointment by the Court of Appeal, for Plaintiff and Respondent.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Christopher J. Rench and Kelly E. LeBel, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

In 2006, defendant Nathan Banks was convicted by a jury of first degree felony murder occurring during the course of the robbery of a drug dealer's apartment with codefendant, Dedric Langston. The evidence presented at trial indicated Langston was the actual shooter and defendant was not in the apartment at the time of the shooting. In 2019, defendant filed a petition for resentencing, pursuant to former Penal Code section 1170.95[1] (§ 1172.6), based upon the changes to the felony-murder rule and the natural and probable consequences doctrine of aider and abettor liability effectuated by Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437). The trial court dismissed his petition, concluding that Senate Bill 1437 was unconstitutional. We reversed the court's order dismissing the petition and remanded.[2]

On remand, the parties stipulated defendant had made a prima facie case for relief. The trial court then held a hearing, considered evidence, and issued a written decision denying defendant's petition based on the findings that defendant was a direct aider and abettor and a major participant who acted with reckless disregard for human life. On appeal, defendant contends insufficient evidence supported the trial court's conclusions. The People disagree. We affirm.

## PROCEDURAL SUMMARY

On March 28, 2005, the Kern County District Attorney filed an information charging defendant and a codefendant with conspiracy to commit first degree robbery (§§ 182, subd. (a)(1), 212.5, subd. (a); count 1); murder of Louis Steele (§ 187, subd. (a); count 2) with burglary and robbery special circumstances (§ 190.2, subd. (a)(17)(A), (G)); attempted murder (§§ 187, subd. (a), 664; count 3); first degree robbery (§ 212.5, subd. (a); count 4); and being a felon in possession of a firearm (former § 12021,

---

[1]    All further statutory references are to the Penal Code. Former section 1170.95 was renumbered section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.) We refer to the current section 1172.6 in this opinion.

[2]    *People v. Banks* (Apr. 27, 2021; F079203) (nonpub. opn.).

subd. (a)(1)); count 5).  The information further alleged that defendant personally used a firearm (§ 12022.53, subd. (b)) in the commission of counts 1 through 4 and had served two prior prison terms (§ 667.5, former subd. (b)).

A jury found defendant guilty on counts 1, 2, 4, and 5, and found all special allegations related to those offenses true.[3]

On March 21, 2006, the trial court sentenced defendant as follows:  on count 2, life without the possibility of parole, plus a 10-year firearm enhancement, and a one-year prior prison term enhancement; on count 1, nine years (the upper term), plus a 10-year firearm enhancement; on count 4, nine years (the upper term), plus a 10-year firearm enhancement; and on count 5, three years (the upper term).  The terms on counts 1, 4, and 5 were stayed pursuant to section 654.

Approximately 13 years later, on February 14, 2019, defendant filed a petition for resentencing pursuant to section 1170.95.  On March 1, 2019, the prosecutor filed a motion to dismiss defendant's petition, arguing that section 1170.95 and other portions of Senate Bill 1437 are unconstitutional.  The trial court granted the prosecutor's motion and dismissed defendant's petition.

On April 27, 2021, we reversed the trial court's order dismissing defendant's petition and remanded the matter for further proceedings.

On December 14, 2022, the parties stipulated that defendant had made a prima facie case for relief.

On October 4, 2023, the trial court issued a written order denying defendant's petition, concluding beyond a reasonable doubt that defendant was a major participant who acted with reckless disregard to human life.

On October 23, 2023, defendant filed a notice of appeal.

---

[3]     Count 3 was dismissed prior to trial.

## FACTUAL SUMMARY

In its order denying defendant's petition, the trial court detailed the documentary evidence it relied upon in reaching its decision and the factual findings it made in reliance on each document. No new evidence was taken. While it made findings regarding the procedural history of the case from other sources (e.g., the information, the jury instructions, the verdict form, the probation report), its findings regarding the substantive offenses were based exclusively on the trial transcript. Defendant does not contend that the trial court's reliance on any admitted document was improper; however, he does challenge several inferences the trial court made from the evidence. In this section we summarize only the trial testimony.

### The People's Case

#### Michael

In February 2005, Michael C. and Louis Steele were in Joe S.'s apartment. Joe asked Michael to stay while Joe and a friend were out of town. At about 8:40 p.m., approximately 30 minutes after Joe left, Steele came to the apartment.

At some point that night, Jordan B., who went by "Pooh," and whom Michael was told to expect, called the apartment's landline. Defendant also called the landline at the apartment that evening. Jordan came to the apartment approximately an hour after she called, sat on the couch, walked into Joe's bedroom where she stayed for approximately one minute, and then left the apartment. Five seconds later, Jordan reentered the apartment followed by defendant and Langston, both of whom were armed with black and silver handguns. When defendant entered the apartment he said, "'Get on the mother-f***ing ground.'" Michael did so. Jordan took Michael's wallet and then defendant told Michael to take his pants off and Michael did so. Defendant "yank[ed]" Michael's shirt off. Defendant then asked Michael where Joe was. Michael told him Joe was out of town. Defendant asked Michael "where the shit" was that they had discussed on the phone. Michael responded he "wasn't saying nothing," and defendant responded,

4.

"'Yes, you did, b***h,'" and hit Michael on the temple with the handgun. Defendant then told Michael to lay facedown on the ground. Defendant said that if Michael looked at him he would "put a bullet in [Michael's] head." Defendant then told Michael to "get [his] a** in the corner [and] pointed towards the corner with the gun." Michael moved to the corner of the living room and knelt.

When Jordan, defendant, and Langston entered the apartment, Langston pointed a handgun at Steele and Steele ran to Joe's bedroom. Langston and Jordan followed him to the bedroom. Michael heard Langston say, "'Where is it at?'" He demanded money and drugs. Michael heard Steele respond, "'This is all I got.'" About four minutes later, Langston brought Steele from the bedroom and directed him to sit on the couch in the living room. While Michael was in the corner and Langston was on the couch, defendant, Jordan, and Langston huddled together and spoke quietly enough that Michael could not make out what they were saying. Langston then directed Michael to sit on the couch next to Steele. While Michael and Steele sat on the couch, defendant and Jordan then left the apartment.

After defendant and Jordan left the apartment, Langston threw bottles onto the floor then asked, "'What else do you … got up in here?'" Steele responded that Joe "'got nothing, he broke.'" As Langston appeared to be about to walk out the door, he turned and shot Michael once, striking his right collarbone, and Steele once, striking the right side of his neck. Langston then left the apartment. Michael checked on Steele, who had fallen onto his stomach and was nonresponsive. Michael ran home and his mother called 9-1-1.

**Jordan**

In February 2005, Jordan and defendant were boyfriend and girlfriend. At the time, they did not have a permanent residence or a vehicle so they stayed with, and got rides from, friends and family. One night, after Jordan and defendant got dinner at a fast food restaurant, they stopped at a liquor store. While outside, they saw Langston driving

5.

an orange van and stopped at a traffic light. Jordan knew Langston because they had gone to school together. Defendant waved Langston down. Langston parked his car in a nearby parking lot and defendant asked Langston for a ride to purchase some marijuana. Langston agreed and picked defendant and Jordan up from the apartment where they were staying about 30 or 45 minutes later.

Not long after Langston arrived, defendant, Jordan, and Langston left for Joe's apartment. Jordan's sister had dated Joe and Joe had previously shown an interest in dating Jordan. Jordan also occasionally purchased marijuana from Joe, but defendant never came into Joe's apartment when she did so. When defendant, Jordan, and Langston arrived at Joe's apartment complex, defendant directed Langston to park in an alley adjacent to the complex. Defendant said he was going to "get" Joe because of the way he treated Jordan. Jordan told defendant he was crazy and, as they walked toward Joe's apartment, tried to convince him not to "do something stupid that would get him into trouble." Defendant agreed "he wouldn't do it," and asked Jordan to go get the marijuana.

When Jordan got to Joe's apartment, Michael let her in. She did not know him, but Joe told her that someone would be there while he was gone. Jordan purchased five dollars' worth of marijuana from Michael and left. As Jordan made her way back to Langston's van, she encountered defendant and Langston. Defendant told Jordan that they were going to get Joe. Jordan disagreed and the two argued until Langston stepped in. Langston told Jordan they were going to the apartment and, when Jordan protested, Langston "pulled a gun out and put it in [her] face." Jordan recognized the gun because it belonged to defendant—it was a chrome gun with black tape and a red rag on the grip. The three then went to Joe's apartment.

Once Jordan, defendant, and Langston entered the apartment, Langston demanded Michael and Steele "give him the weed and the money." Michael and Steele both said they didn't know what Langston was talking about. Steele then grabbed the barrel of

6.

Langston's handgun. Defendant then took the telephone from Michael's hand and hit Michael in the head with it. At the same time, Langston pushed Steele onto the couch and told Jordan to empty Michael's pockets. Jordan took Michael's wallet and gave it to defendant. Defendant told Steele to take everything out of his pockets and put it on the couch. Steele complied. Langston then demanded to know where the marijuana was. Steele told him it was in the bedroom. Langston then directed Jordan and Steele to the bedroom. Langston directed Steele to get the marijuana. Steele did so and gave it to Langston. Langston then told Steele to lay motionless on the bed. Langston said that if Steele moved, Langston would shoot him. Langston and Jordan then went back to the living room.

When Jordan and Langston returned to the living room, they found Michael on the ground, stripped to his underwear. Defendant standing over him, cursing at him and hitting him. Defendant hit Michael more than one time and less than 10 times. Defendant then told Michael to go sit in the corner of the room and Michael complied. Defendant then walked to Langston and asked him, "did he get it[?]" Langston said yes. Defendant then asked Langston, "is he going to do it," and Langston said yes. Defendant told Langston, "if he does it, he has to do it right." Langston said he "kn[e]w." Defendant then removed the base for the cordless phone from the wall, took the keys to the van from Langston, and left the apartment. Less than a minute later, Jordan left the apartment. When she left, Steele was in the bedroom.

Jordan then returned to Langston's van, where defendant sat in the driver seat. Defendant told her that he needed to use her to get into Joe's apartment. At that point, Jordan heard four or five gunshots from the direction of Joe's apartment. Shortly after, Langston returned to the van and sat into the passenger seat. Defendant asked Langston, "did he do it?" Langston responded "'Yeah,' because the one in red knew him. They went to school together."

After leaving Joe's apartment, defendant, Langston, and Jordan went to a grocery store parking lot, where they split the money and marijuana that they had taken. Langston asked defendant if he thought Jordan would tell anyone what they had done. Defendant said he would make sure she did not say anything. After Langston left Jordan and defendant, defendant told Jordan that if she said anything about what happened she would "find [her]self like the other two."

**Defense Case**

### Defendant

Defendant testified that he and Jordan became boyfriend and girlfriend in September or October 2004. They continued to be in the same relationship when the events at issue in this case took place. Defendant knew Langston "from around the neighborhood" and knew "a lot of his family members." Defendant knew Joe because they "grew up together" and lived in the same neighborhood. Defendant went to Joe's apartment complex with Jordan so she could purchase marijuana, but he did not go into Joe's apartment. Defendant was aware that Joe and Jordan had some relationship before he began dating Jordan. He did not know Michael or Steele. He had never seen Michael, other than in court.

On February 18, 2005, defendant was at his cousin's home with Jordan and others. He knew that Jordan had called Joe two or three times to arrange purchasing marijuana for defendant. Defendant gave Jordan five or 10 dollars to make the purchase. Jordan told defendant that she had found someone to give her a ride to Joe's apartment. Defendant did not go with Jordan to Joe's apartment. Defendant went with Jordan to a fast food restaurant and a liquor store, but he did not interact with Langston in the liquor store parking lot that night.

After defendant and Jordan returned from the liquor store, Jordan stayed with defendant at his cousin's home for "a minute and then she left" to purchase marijuana from Joe. She returned 45 minutes to an hour later and "seemed kind of disturbed."

8.

When defendant asked Jordan what was wrong she said she did not want to talk about it. Defendant did not find out about the murder until later. Defendant did not go with Jordan, did not participate in the robbery, and had never been inside Joe's apartment. Defendant did not possess a firearm.

**DISCUSSION**

The trial court denied defendant's petition based on the findings that defendant (1) directly aided and abetted Langston, who was the actual killer, and (2) was a major participant who acted with reckless disregard to human life. Defendant contends the trial court's factual findings were not supported by substantial evidence. The People disagree, as do we.

### A.    *Legal Background*

Effective January 1, 2019, the Legislature passed Senate Bill 1437 "to amend the felony murder rule and the natural and probable consequences doctrine … to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) As relevant here, the bill eliminated second degree murder liability predicated on the natural and probable consequences doctrine. (§ 188, subd. (a)(3), as amended by Stats. 2018, ch. 1015, § 2; *People v. Strong* (2022) 13 Cal.5th 698, 707, fn. 1 (*Strong*).)

The bill also added former section 1170.95, now section 1172.6, to provide a procedure for those convicted of a qualifying offense, including, as relevant here, murder, to seek resentencing. (§ 1172.6, subds. (a)–(c).) If the sentencing court determines the petitioner has made a prima facie showing, the court must issue an order to show cause and hold a hearing to determine whether to vacate the murder or manslaughter conviction. (*Id.*, subds. (c), (d)(1).) At the evidentiary hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of

9.

murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (*Id.*, subd. (d)(3).)

### B. Standard of Review

"[A] trial court's denial of a section 1172.6 petition is reviewed for substantial evidence. [Citation.] Under this standard, we review the record ""in the light most favorable to the judgment below to determine whether it discloses substantial evidence— that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty [of murder under a still-valid theory] beyond a reasonable doubt.""" (*People v. Reyes* (2023) 14 Cal.5th 981, 988.)

We will not reverse unless there is no hypothesis upon which sufficient substantial evidence exists to support the trial court's decision. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) We must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Jones* (1990) 51 Cal.3d 294, 314.) "The same standard applies when the conviction rests primarily on circumstantial evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "An appellate court must accept logical inferences that the [trier of fact] might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

### C. Banks/Clark Factors

In *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*), our Supreme Court listed the following as "[a]mong those factors" that may be considered in determining "whether the defendant's participation … was sufficiently significant to be considered 'major'": "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the

death?  What did the defendant do after lethal force was used?"  (*Id.* at p. 803, fn. omitted.)

As to "[r]eckless indifference to human life[, it] has a subjective and an objective element.  [Citation.]  As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.'  [Citations.]  As to the objective element, '"[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation."'"  (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*).)  Reckless indifference "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*People v. Clark* (2016) 63 Cal.4th 522, 617 (*Clark*); accord, *Strong, supra*, 13 Cal.5th at p. 706.)

"We analyze the totality of the circumstances to determine whether [the defendant] acted with reckless indifference to human life.  Relevant factors include:  Did the defendant use or know that a gun would be used during the felony?  How many weapons were ultimately used?  Was the defendant physically present at the crime?  Did he or she have the opportunity to restrain the crime or aid the victim?  What was the duration of the interaction between the perpetrators of the felony and the victims?  What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force?  What efforts did the defendant make to minimize the risks of violence during the felony?  [Citation.]  '"[N]o one of these considerations is necessary, nor is any one of them necessarily sufficient."'"  (*Scoggins, supra*, 9 Cal.5th at p. 677.)

The requirements of being a major participant and having reckless indifference to human life overlap, "'for the greater the defendant's participation in the felony murder,

11.

the more likely that he acted with reckless indifference to human life.'" (*Clark, supra*, 63 Cal.4th at p. 615.) Thus, a "trial court's factual finding that [the defendant] was a major participant in the underlying felony is—itself—supportive of the court's additional factual finding that [the defendant] acted with reckless indifference to human life." (*People v. Cody* (2023) 92 Cal.App.5th 87, 113; see *Scoggins, supra*, 9 Cal.5th at p. 677.)

Because of this overlap, we apply the *Banks*/*Clark* factors together, and, in viewing the totality of the circumstances, we conclude the record contains substantial evidence to support the trial court's conclusion that defendant was a major participant in the robbery who acted with reckless indifference to human life.

### 1.    Role in Planning the Robbery

Here, the trial court found, "[f]rom the way in which the robbery was effectuated, it is clear planning took place and that [defendant] was involved in planning of the robbery. Langston's and [defendant]'s movements in entering the apartment, robbing the two men, and seeking out more money and drugs were coordinated actions and such coordination requires planning. After [Jordan] and [defendant] left the apartment[, defendant] said he was sorry for using [Jordan] to get into the apartment. Obviously[,] using [Jordan] to gain access to the apartment was part of a plan and [defendant] was in on the planning." The trial court's findings were all based on direct testimony and logical inferences from such testimony. Moreover, Jordan testified that defendant told her that he and Langston were going to "get" Joe before and after she went into Joe's apartment the first time. Accordingly, the evidence establishes that defendant had an active "role … in planning the criminal enterprise that led to [the victim's] death[]." (*Banks, supra*, 61 Cal.4th at p. 803.)

### 2.    Supplying or Using Lethal Weapons

The trial court's findings with relation to supplying and using weapons were based on the testimony: "As testified to by [Jordan], the gun used to shoot Steele and [Michael] was actually [defendant]'s gun." Further, Michael testified that defendant was also armed

12.

with a firearm and struck him on the temple with it. As the trial court found, "[t]he testimony of [Jordan] claiming [defendant] used a phone to hit [Michael] is not believable. The jury found that [defendant] committed all of the crimes while he personally used a firearm." Accordingly, there was substantial evidence that defendant both supplied a firearm to Langston and himself used a firearm in the commission of the offense.

### 3. Physical Presence at the Robbery and Opportunities to Restrain the Crime and/or Aid the Victims

"Proximity to the murder and the events leading up to it may be particularly significant where … the murder is a culmination or a foreseeable result of several intermediate steps, or where the participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force. In such cases, 'the defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state…. [Moreover,] the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts. If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders.'" (*Clark, supra*, 63 Cal.4th at p. 619.)

Here, according to Jordan, Langston pointed a handgun at her prior to entering the apartment, had the handgun exposed when they entered the apartment such that Michael was able to grab the barrel, pointed the handgun at Jordan while directing her to turn out Michael's pockets, and ordered Steele to lay on the bed with the warning that Langston would shoot him if he moved (within earshot of defendant). Also according to Jordan, defendant struck Michael with a telephone when Michael grabbed the barrel of Langston's firearm and then hit Michael between two and nine times while Michael was on the ground. Defendant also asked Langston if he was "going to do it" and, if so, to "do it right." The trial court reasonably construed that interaction as relating to defendant

13.

asking whether Langston intended to shoot Michael and Steele, especially in light of what immediately followed.

Michael's account was no less condemning. Defendant commanded Michael and Steele to get on the ground, told Michael to take off his pants, "yank[ed]" Michael's shirt off, hit Michael on the temple with a handgun, and told Michael he would "put a bullet in [his] head" if he looked at defendant. Michael also testified than Langston pointed a handgun at Steele.

Both accounts demonstrate that defendant and Langston took violent intermediate steps and demonstrated a willingness to do violence. Defendant had an opportunity to restrain Langston, but instead of telling him not to harm Michael and Steele, told him if he was "going to do it" then he had to "do it right." Defendant's contention that the trial court was not permitted to "'surmise[]' that [he] told Langston to shoot." However, the trial court was permitted to make reasonable inferences from the evidence. Defendant asking Langston if he was "going to do it" and encouragement that he "do it right" before the shooting, and then asking Langston "did he do it" after the shooting provided sufficient circumstantial evidence for the trial court to infer that defendant was referring to shooting Michael and Steele.

Further, the record supports the conclusion that defendant did nothing to aid Michael or Steele despite having been in a position to do so. As the People note, by disconnecting the phone from the wall, defendant also made it less likely for Michael and Steele to be able to call for help.

### 4. Duration of Felony

With respect to the duration of the felony, "[c]ourts have looked to whether a murder came at the end of a prolonged period of restraint of the victims by defendant.… Where a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, 'there is a greater window of opportunity for violence' [citation], possibly culminating in murder." (*Clark, supra*, 63 Cal.4th at p. 620, fn.

14.

omitted.) In this case, based on the time Michael reported Jordan came to the apartment and when Michael's mother called the police, the robbery and killing likely took place in less than 20 minutes.[4] This factor does not weigh in favor of finding defendant acted with reckless indifference, but it does not alter our view of the totality of the circumstances. (*Clark, supra*, at p. 618 ["'[N]o one of these considerations is necessary, nor is any one of them necessarily sufficient.'"].)

### 5. Defendant's Knowledge of Langston's Likelihood of Killing

As noted above, defendant and Langston had a quiet conversation before defendant and Jordan left the apartment. That conversation included defendant asking Langston, who was armed with a firearm, whether he was "going to do it," and when Langston said yes, admonishing him to "if he does it, he has to do it right." At that point, the goal of taking the marijuana and money appeared to have been accomplished. As the trial court rightly found, "[t]here was no other reason to leave Langston behind except to inflict injury upon Steele and [Michael]. The perpetrators had already gotten all of the available … money and drugs out of the apartment." Consistent with that understanding, when Langston returned to the van, defendant asked him "did he do it?" and Langston responded, "'[y]eah,' because the one in red knew him. They went to school together."[5] Jordan testified that after that brief conversation, defendant drove them away from the area rather than asking any follow-up questions. On that record, substantial evidence exists to support the finding that defendant knew Langston was likely to shoot Michael and Steele.

---

[4] The longest estimate for the duration of the entire encounter was an hour from Michael.

[5] Defendant contends that Langston's comment that "the one in red knew him" suggests that the shooting was Langston's idea alone. In light of the preceding conversation, defendant having supplied the weapons, and defendant having enlisted Langston's help, that reading is not plausible and certainly not the only reasonable inference a trier of fact could have made from the evidence. (*People v. Maury, supra*, 30 Cal.4th at p. 396.)

The trial court noted "[o]bviously, the shooting was not a surprise to [defendant]." Defendant contends that the shooting not being a surprise to defendant provides no evidence that defendant directly aided and abetted the shooting. That argument ignores the broader context of the robbery and shootings. Defendant provided a firearm to Langston, confirmed that Langston intended to shoot Michael and Steele before leaving Joe's apartment, encouraged him to "do it right," and confirmed that Langston had shot Michael and Steele when Langston returned to the vehicle. The court's understatement that the shooting was not a surprise to defendant does not undercut our conclusion that this factor weighs strongly in favor of finding that defendant acted with reckless disregard to human life.

### 6. Increased Risk of Danger Posed By the Target of the Robbery

The trial court concluded "that a fact which must be considered when determining whether an elevated risk of danger exist[s] in an armed robbery is the intended victim of the robbery.… [R]obbery of a drug dealer heightens the risk to human life … [because those] who earn large amounts of money thr[ough] criminal enterprises tend to defend their ill-gotten gains with guns. Anyone attempting to rob a drug dealer should anticipate an armed resistance." Defendant contends that the court's conclusions with respect to the risks associated with robbing a drug dealer were "devoid of any evidentiary support." We disagree with defendant. Multiple courts have held that the robbery of a drug dealer, by nature, is a "particularly risky crime" and "not a garden-variety robbery." (*In re McDowell* (2020) 55 Cal.App.5th 999, 1011, 1013 [planning and taking part in armed robbery of a drug dealer supported trial court's major participant and reckless indifference findings]; accord, *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1089–1090 [the defendant's participation in planning and executing armed home invasion robbery of marijuana dealer supported finding of reckless indifference]; *People v. Mora* (1995) 39 Cal.App.4th 607, 617.)

In short, we agree with the trial court that the nature of the robbery defendant planned—a robbery of a drug dealer's home—increased the risk of violence. This factor weighs in favor of finding defendant was a major participant and acted with reckless disregard to human life.

### 7. Efforts to Minimize Risk of Violence

The record suggests defendant made no effort to minimize the risk of violence. Indeed, as noted above, defendant struck Michael with a handgun and later struck Michael repeatedly while standing over him. Defendant also threatened to "put a bullet in [Michael's] head" if Michael looked at him.

### 8. Defendant's Conduct After Lethal Force Was Used

When Langston returned to the van after shooting Michael and Steele, defendant confirmed that Langston "did … it." Defendant then drove from the area and split the marijuana and money with Langston. When parting with Langston, defendant reassured Langston that "he [was] going to make sure [Jordan] don't say nothing." When defendant and Jordan returned to the apartment where they were staying, he told her that if she "sa[id] anything, [she was] going to find [her]self like the other two," referring to Michael and Steele. Defendant's sharing in the profits and threatening Jordan both weigh in favor of finding defendant was a major participant in the crime and acted with reckless disregard for human life.

### 9. Conclusion

Substantial evidence supports the findings that defendant was a major participant in the robbery that led to Steele's death and acted in reckless disregard for human life. In other words, substantial evidence supports the trial court's finding that defendant is still guilty of first degree murder following the passage of Senate Bill 1437. Accordingly, defendant is ineligible for resentencing relief under section 1172.6 and, thus, the court correctly denied his petition.

## **DISPOSITION**

The order is affirmed.

MEEHAN, J.

WE CONCUR:

SMITH, Acting P. J.

SNAUFFER, J.

18.